Exhibit B
STATEMENT OF CLAIMS

COUNT I
PREGNANCY AND SEX-BASED DISCRIMINATION
Title VII, 42 U.S.C. § 2000e
WLAD, RCW 49.60.180
(Against Warner Bros. Discovery, Zhang, Devkar)

Issue:

Did Defendants Warner Bros. Discovery (WBD), Zhang, and Devkar discriminate against Plaintiff by terminating her due to her pregnancy?

Rule:

Title VII and WLAD prohibit discrimination based on pregnancy. Under McDonnell Douglas, Plaintiff must show: (1) protected class (pregnant); (2) qualified; (3) adverse action; (4) disparate treatment. Defendants must offer a legitimate reason, rebuttable as pretext (McDonnell Douglas Corp. v. Green, 411 U.S. 792, 1973).

Analysis:

1. Plaintiff Establishes Prima Facie Case Under McDonnell Douglas

1. Protected Class Status Plaintiff was pregnant and sent written notifications to WBD HR via multiple emails from May 1st, 2023 to May 18th, 2023. (Facts 37-39). Pregnancy discrimination constitutes sex discrimination under Title VII and WLAD.

2. Qualified for the Position Plaintiff was a qualified employee with no performance issues or complaints. (Facts 5-9, 53, 131, 143.g). Her technical competence and work quality were consistently satisfactory prior to her pregnancy disclosure.

3. Adverse Employment Action Plaintiff was terminated on September 13, 2023. (Fact 80). Termination constitutes an adverse employment action under both Title VII and WLAD.

4. Disparate Treatment Male engineers were retained during the same period (Fact 20), and a male peer was promoted during Plaintiff's 2021 pregnancy (Fact 9). This evidence establishes that similarly situated male employees received more favorable treatment.

2. Defendants' Stated Justifications Are Pretextual And Reflect Bad Faith

Having established her prima facie case, the burden shifts to Defendants to articulate legitimate, non-discriminatory reasons for termination. WBD's proffered reasons constitute pretext for unlawful discrimination based on pregnancy and sex, as demonstrated by systematic fabrication of justifications, altered documentation, and deliberate destruction of evidence.

1. The "Job Elimination" Rationale Lacks Credibility

WBD's initial assertion that Plaintiff's termination resulted from "job elimination" (Fact 82) is contradicted by substantial evidence:

1. Absence of Required WARN Act Notice. WBD failed to provide Worker Adjustment and Retraining Notification Act notice in Washington State, where Plaintiff was employed, or in New York or California, where WBD maintains operations. (Fact 84; 29 U.S.C. § 2101 et seq.). This statutory violation undermines WBD's claim of legitimate workforce reduction.
2. Immediate Team Expansion. Within one week of Plaintiff's September 13, 2023 termination, WBD's Personalization team hired eight new employees. (Fact 23). This contemporaneous expansion directly contradicts any assertion of position elimination and demonstrates the pretextual nature of the stated rationale.
3. Internal Evidence Contradiction. During the EEOC investigation, WBD submitted a partial internal screenshot (Fact 137), stating the reason for termination was "low performer" and preferred by manager "Maggie Zhang" (Xiaotong Zhang) to terminate by "9/1/2023".

2. The "Low Performance" Justification Relies on Fabricated Documentation

WBD's alternative "low performance" rationale (Facts 135f-h) depends entirely on falsified records created by Defendant Xiaotong Zhang through a deliberate scheme of document manipulation:

1. Temporal Proximity Establishes Discriminatory Intent. On May 18, 2023, Plaintiff submitted a reasonable accommodation request for her high-risk pregnancy at 12:10 PM. (Fact 42). A mere five hours later, at 17:17 PM, Zhang began systematically editing Plaintiff's 1:1 performance notes, creating fabricated entries for meetings that never occurred. (Facts 44, 73). This close temporal relationship between Plaintiff's protected activity and Zhang's document falsification establishes a strong inference of discriminatory motivation under McDonnell Douglas.

2. Systematic Falsification of Performance Records. Zhang's alterations created a false historical record of performance deficiencies that did not exist contemporaneously. The fabricated entries purported to document meetings and performance discussions that never took place, constituting deliberate fraud in the employment context.

3. Concurrent Efforts to Manufacture Alternative Pretextual Justifications. During this same period of document falsification, in August 2023, Zhang simultaneously pursued additional pretextual grounds for termination. (Fact 73). During a 1:1 meeting on August 22, 2023, Zhang expressed urgency and anger toward Plaintiff regarding work tickets, despite acknowledging that no work progress was impacted during Plaintiff's absence and that another engineer was also on leave. (Fact 74). Most significantly, Zhang sought to terminate Plaintiff's employment during prearranged leave, consulting HR to identify a legally defensible reason, such as "abandoning work," which was deemed unviable after Zhang confirmed she knew Plaintiff's whereabouts. (Fact 73, 101). Zhang subsequently disclosed these efforts to Plaintiff, warning her against taking future leave, including for medical needs, and directing all leave requests to HR without providing HR contact information, contrary to WBD's policy requiring manager notification of leave. This pattern demonstrates Zhang's systematic search for pretextual justifications while simultaneously fabricating performance records.

3. WBD's Shifting Rationales Demonstrate Pretext Under McDonnell Douglas

WBD's inability to maintain consistent justifications further evidences pretext under the McDonnell Douglas framework:

1. Evolving Explanations. WBD has proffered three distinct rationales: "job elimination," "low performance," and subsequently a "$5 billion restructuring." (Fact 135a). This pattern of shifting

explanations is characteristic of pretextual justifications under McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804-05 (1973).

2. Lack of Due Diligence. Defendant Deepna Devkar approved Plaintiff's termination despite having no direct contact with Plaintiff and no independent knowledge of her performance. (Fact 18). Devkar's reliance on Zhang's falsified records, without adequate investigation, demonstrates institutional complicity in the discriminatory process and the lack of legitimate basis for the termination decision.

4. Systematic Evidence Destruction and Obstruction Reflects Consciousness of Guilt

WBD's conduct demonstrates a deliberate pattern of obstruction, delay, and evidence destruction that undermines the credibility of their proffered justifications:

1. Obstruction of Personnel File Requests. Beginning in September 2023, Plaintiff made four separate requests for her personnel files. WBD's HR department consistently refused these requests, falsely claiming "We don't have formal personnel profiles in a folder to send." WBD finally produced personnel files on January 22, 2024, only after months of delay and obstruction. This pattern of delay and false statements about the existence of personnel files demonstrates WBD's systematic efforts to prevent Plaintiff from accessing evidence of discrimination.

2. Destruction of Protected Activity Records. Following Plaintiff's termination, WBD deleted records of her Family and Medical Leave Act claim and short-term disability application filed with Hartford on August 23, 2023, for leave beginning January 2024. (Fact 76). This destruction of evidence relating to Plaintiff's protected activities suggests consciousness of guilt.

3. Implementation of Evidence Destruction Policies. WBD implemented a 180-day email deletion policy and migrated on-call logs to PagerDuty after litigation hold was imposed. (Facts 146-149). Employee suspicions of intentional evidence destruction (Fact 144b) corroborate the systematic nature of these efforts.

4. Deliberate Destruction of Document Edit Histories Despite Actual Knowledge of Falsification. WBD's most egregious act of evidence destruction occurred with full knowledge of the document falsification. On September 29, 2023, during WBD's internal investigation, Plaintiff provided Patrice Grimes with direct access to the falsified Google Doc, stating: "The following are screenshots from the 1:1 doc that should have been shared with Plaintiff. But it was only shared once in July 2022. Plaintiff is not aware of or in consensus of the edits in the doc. The backdate, predate and re-edit history are preserved by screenshots of the google doc. Link: https://docs.google.com/document/d/1XgOFjZRJ6ZzdAjinC3inrWY3K7vtk15O0YGjlc7rv3M."

This communication provided WBD with actual knowledge that: (1) the documents contained falsified entries, (2) the edit histories proved the falsification, and (3) the evidence was preserved in the Google Doc format.

Despite this actual knowledge, WBD subsequently issued litigation hold notices to preserve documents pertaining to Plaintiff, then immediately revoked employee access to Google Drive and migrated documents from Google Docs to OneNote without preserving edit histories. (Facts 133-134). Current employees reported these actions to Plaintiff on February 2, 2024, confirming that edit histories were not preserved during migration, despite being technically feasible to transfer with full metadata. This deliberate destruction of edit histories, occurring months after WBD received actual notice of the falsification and the probative value of the edit histories, eliminated the digital forensic evidence that definitively proved Zhang's systematic falsification of Plaintiff's performance records.

5. Selective and Misleading Document Production. WBD engaged in systematic manipulation of evidence through selective presentation of email communications. Specifically, WBD produced email exchanges between Plaintiff and Lucille showing that Lucille scheduled a phone call with Plaintiff following termination, but deliberately omitted subsequent correspondence showing that Lucille cancelled the call. This selective editing of email chains creates a false narrative and demonstrates WBD's willingness to manipulate evidence to support its position, further evidencing bad faith conduct in litigation.

4. Pattern of Sex-Based Discrimination Supports Individual Claim Under McDonnell Douglas

Zhang's documented bias against female engineers provides crucial context supporting Plaintiff's individual discrimination claim and establishes a broader pattern that reinforces the inference of discriminatory intent:

1. Targeting of Female Engineers Under Zhang's Authority. At the time of termination, Plaintiff was the sole female engineer reporting directly to Zhang. This singular status makes her termination particularly suspect and demonstrates targeted discrimination against the only woman under Zhang's direct supervisory authority.

2. Systematic Deception and Perjury in EEOC Proceedings. Zhang's conduct before the EEOC demonstrates a deliberate pattern of obstruction and perjury that prevented federal enforcement action: a. Reversal of EEOC Cause Finding. The EEOC initially determined to issue a partial cause finding for failure to accommodate. However, this determination was reversed following Zhang's sworn statement, which contained multiple material misrepresentations made under penalty of perjury. b. False Claims Regarding Document Review. Zhang testified under oath that she had reviewed "all business records" relating to Plaintiff's employment, when in fact WBD had already implemented systematic destruction of relevant documentation, including the 180-day email deletion policy and migration of on-call logs. This testimony was materially false and made with knowledge of the document destruction. c. Perjurious Testimony Regarding Employment Timeline. Zhang testified under oath that Plaintiff began working under her supervision in October 2022, when corporate records and Slack messages definitively establish that Plaintiff began working with Zhang in June 2022. This four-month discrepancy in basic employment facts, easily verifiable through corporate records, demonstrates either willful perjury or reckless disregard for the truth. d. Obstruction of Federal Investigation. Zhang's false testimony under oath prevented the EEOC from pursuing federal enforcement action, effectively obstructing a federal civil rights investigation. This conduct constitutes a separate violation of federal law and demonstrates consciousness of guilt regarding the underlying discrimination.

3. Material Misrepresentations Regarding Knowledge and Involvement. Zhang's contradictory statements about her knowledge of Plaintiff's termination create additional credibility issues that undermine her testimony. On September 13, 2023, when Plaintiff asked Zhang if she had prior knowledge about the termination, Zhang replied: "I am hearing about it today," "I don't know and I can't say — I only just found out about you." (Fact 80). Zhang continued to ask Plaintiff to work after HR had notified her of the termination. However, WBD's legal counsel subsequently represented to the EEOC that Zhang knew about the termination the day BEFORE it occurred. This direct contradiction between Zhang's contemporaneous statements to Plaintiff and WBD's official position creates a material inconsistency that demonstrates either perjury or institutional coordination to conceal Zhang's involvement in the discriminatory termination decision.

4. Post-Termination Pattern Confirms Discriminatory Intent. Following Plaintiff's termination, WBD hired additional female engineers into Zhang's team, who subsequently experienced the

same pattern of disparate treatment documented in the record. This continuing discriminatory conduct against female engineers confirms that Zhang's bias was not an isolated incident but represents systematic discrimination based on sex.

5. Disparate Treatment of Female Employees. Zhang consistently denied flexible time-off requests submitted by female engineers while approving identical requests from male colleagues. (Facts 143-145).

6. Hostile Work Environment. Zhang exhibited hostile conduct specifically targeting female engineers, creating a discriminatory work environment that culminated in Plaintiff's termination during her pregnancy.

5. Substantial Harm Resulting from Defendants' Misconduct

The discriminatory conduct and systematic falsification of records caused severe harm to Plaintiff:

1. Diagnosed Trauma and Stressor-Related Disorder. Plaintiff was diagnosed with Trauma and Stressor-Related Disorder (F43.9) directly attributable to the termination, falsified records, and related misconduct. (Fact 150).

2. Career and Reputational Damage. The falsified performance records and improper termination have damaged Plaintiff's professional reputation and career prospects in the technology industry.

Conclusion:

Under the McDonnell Douglas burden-shifting framework, Plaintiff has established her prima facie case by demonstrating that she was: (1) a member of a protected class (pregnant), (2) qualified for her position, (3) subjected to adverse employment action (termination), and (4) treated less favorably than similarly situated male employees.

The burden shifted to Defendants to articulate legitimate, non-discriminatory reasons for termination. WBD's proffered justifications of "job elimination," "low performance," and "restructuring" fail to meet this burden due to their internally inconsistent and contradictory nature.

The burden has shifted back to Plaintiff to demonstrate pretext, which she has overwhelmingly established through: (1) the temporal proximity between her pregnancy accommodation request and the commencement of document falsification, (2) the immediate expansion of her purportedly "eliminated" position, (3) the systematic destruction of evidence with actual knowledge of its probative value, (4) the pattern of sex-based discrimination against female engineers, (5) Zhang's concurrent efforts to manufacture alternative pretextual justifications during her leave, and (6) the material contradictions in Zhang's statements regarding her knowledge and involvement in the termination decision.

The evidence establishes a clear pattern of pretext and bad faith discrimination. WBD's shifting rationales, systematic document falsification, deliberate evidence destruction, perjury in federal proceedings, concurrent efforts to manufacture pretextual justifications, and pattern of sex-based discrimination create a compelling inference of unlawful conduct under Title VII (42 U.S.C. § 2000e-2(a)(1)) and WLAD (RCW 49.60.180(2)) that warrants substantial relief including compensatory damages, punitive damages, and attorney fees.

COUNT II
RETALIATION
Title VII,
42 U.S.C. § 2000e-3 WLAD,
RCW 49.60.210
(Against Warner Bros. Discovery, Zhang, Lucille)

Issue:

Whether Defendants Warner Bros. Discovery, Inc. (WBD), Xiaotong Zhang, and Hannah Lucille unlawfully retaliated against Plaintiff for engaging in protected activity by requesting pregnancy-related reasonable accommodations under federal and state anti-discrimination laws.

Rule:

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), and the Washington Law Against Discrimination (WLAD), RCW 49.60.210, prohibit retaliation against employees who oppose unlawful employment practices or request reasonable accommodations for pregnancy-related conditions. To establish a prima facie case of retaliation, Plaintiff must demonstrate: (1) engagement in statutorily protected activity; (2) knowledge by the employer of such protected activity; (3) subsequent adverse employment action; and (4) causal connection between the protected activity and the adverse action. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006); *Hashimoto v. Dalton*, 118 F.3d 671, 680 (9th Cir. 1997). If Defendant articulates a legitimate, non-retaliatory reason for the adverse action, Plaintiff must demonstrate that the proffered reason is pretextual. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973).

Analysis:

1. Protected Activity: On May 1, 2023, Plaintiff formally requested pregnancy-related reasonable accommodations by emailing HR specialists Ana Hernandez and Fannie Moy, specifically requesting removal from 24/7 on-call duties due to medical restrictions limiting her to 40 hours per week (Facts 38-42). This constitutes protected activity under both Title VII's pregnancy accommodation provisions and WLAD's disability accommodation requirements.

2. Employer Knowledge: Defendants had actual knowledge of Plaintiff's protected activity. Zhang acknowledged learning of Plaintiff's "protected status" from HR on July 21, 2023, confirming corporate awareness of the accommodation request (Fact 60). HR's failure to respond to Plaintiff's accommodation request (Fact 43) further establishes institutional knowledge.

3. Adverse Employment Action: Plaintiff suffered termination on September 13, 2023, constituting per se adverse employment action under *Burlington Northern* (Fact 80). Additionally, Plaintiff experienced constructive adverse actions including Zhang's public humiliation calling her a "robot" during team meetings (Fact 50), unilateral fabrication of negative performance documentation (Facts 44, 61), and deliberate isolation from team communications (Fact 51).

4. Causal Connection: Multiple factors establish causal nexus between Plaintiff's protected activity and adverse treatment:

1. Temporal Proximity: Zhang began systematically fabricating negative performance documentation on May 18, 2023, at 17:17—the same date Plaintiff submitted her accommodation request—marking "the first time Xiaotong Zhang accessed the 1:1 doc and the beginning of fabrication of performance documentation" (Fact 44).

2. Contemporaneous Retaliatory Conduct: Zhang's pattern of backdating and falsifying performance records intensified following the accommodation request, with extensive document manipulation occurring on July 21, 2023, immediately after consulting HR about Plaintiff's protected status (Facts 59-61).

3. Direct Admissions: Zhang explicitly admitted to Plaintiff that she had "contacted HR and asked for ways to fire the Plaintiff to get a legally defensible reason" during Plaintiff's approved family leave, demonstrating retaliatory intent (Fact 73).

4. Disparate Treatment: Zhang denied Plaintiff's repeated requests to visit the Seattle office for team meetings while permitting similar requests from male colleagues, evidencing discriminatory animus (Fact 29).

5. Pretext Analysis: Defendants' articulated reason for termination—"Job Elimination" due to restructuring—is demonstrably pretextual:

1. Lack of Legitimate RIF Indicators: No WARN Act notices were filed in any relevant jurisdiction, and no internal or external layoff announcements were made (Facts 83-84), inconsistent with legitimate workforce reduction.

2. Immediate Replacement Hiring: Within one week of Plaintiff's termination, eight new employees were added to the team (Fact 23), directly contradicting any claim of position elimination.

3. Fabricated Post-Litigation Claims About On-Call Duties: Zhang's May 12, 2025 sworn declaration claiming engineers "rarely worked more than 40 hours per week, even if they are on-call" and that "most, if not all, alerts auto-resolve within 10-15 minutes without any intervention" (Facts 141f, 141m) constitutes perjurious testimony contradicted by the actual working conditions:

   1. Immediate Response Requirements: On-call duty required engineers to respond within one to three minutes of alerting, if fail to respond, it would escalate to constant phone calls and to the wider organization and upper management, necessitating constant availability and inability to turn off cell phones, as confirmed by other team members;
   2. Travel Restrictions: Engineers were required to arrange on-call coverage even for air travel, demonstrating the intrusive nature of the duty that substantially impacts personal life beyond normal working hours;
   3. Managerial Exemption: Zhang deliberately exempted herself from on-call duties and escalation policies, unlike managers on other teams who participated in primary on-call rotation (Fact 33), revealing her knowledge of the duty's burdensome nature;
   4. Contradictory Management Behavior: Zhang's aggressive response to Plaintiff's Canadian vacation, demanding immediate on-call coverage and Plaintiff had to do arrangements at midnight on Sunday (Facts 63-67), directly contradicts her later sworn testimony that on-call duties were minimal and rarely required intervention;
   5. Logical Inconsistency: If on-call duties were truly as minimal as Zhang claimed post-litigation, the accommodation request would have been unnecessary and easily

granted as it had little impact on the business, and Zhang's insistence on maintaining Plaintiff on the rotation while pregnant would be both medically contraindicated and operationally pointless.

4. Systematic Evidence Destruction: Defendants implemented an automatic 180-day email deletion policy within six months of receiving litigation hold notices, and migrated on-call management systems from Splunk On-Call to PagerDuty, eliminating historical records needed to verify Zhang's false claims about on-call frequency (Facts 146-149).

5.. Contradictory Decision-Making Claims: Defendants' EEOC response falsely claimed Deepna Devkar was the "sole decision maker" with no knowledge of Plaintiff's protected status, while simultaneously asserting that Zhang had "no direct input into the decisions" (Facts 135a, 135c, 135d). However, internal "RIF" documentation identifies Zhang as "Direct Manager" with input into termination decisions (Fact 137), revealing fabricated testimony.

6. Hannah Lucille's Liability: Lucille actively participated in the retaliation by: (1) refusing to investigate Plaintiff's discrimination complaints (Fact 112); (2) denying severance negotiations contingent on Plaintiff's cooperation with a sham internal investigation (Facts 94-96); and (3) ultimately concluding that WBD could not "substantiate" Plaintiff's claims despite overwhelming documentary evidence (Fact 112), demonstrating deliberate indifference to federal anti-retaliation protections.

Conclusion:

Defendants WBD, Zhang, and Lucille are jointly and severally liable for unlawful retaliation under Title VII and WLAD. Plaintiff's accommodation request constituted protected activity, Defendants had actual knowledge thereof, Plaintiff suffered adverse employment actions, and the causal connection is established through temporal proximity, direct admissions of retaliatory intent, and systematic fabrication of performance documentation. Defendants' proffered legitimate reason for termination is pretextual, as evidenced by immediate replacement hiring, lack of proper RIF procedures, perjurious post-litigation testimony minimizing on-call duties, and deliberate destruction of evidence. Zhang's contradictory statements about the nature of on-call work—claiming it was minimal while simultaneously demanding strict compliance and coverage—reveal both her retaliatory intent and the fabricated nature of her defensive testimony.

COUNT III
FAILURE TO ACCOMMODATE
Pregnant Workers Fairness Act,
42 U.S.C. § 2000gg ADA,
42 U.S.C. § 12112 WLAD,
RCW 49.60.180
(Against Warner Bros. Discovery, Lucille)

Issue:

Did Defendants Warner Bros. Discovery, Inc. (WBD) and Hannah Lucille fail to provide reasonable accommodations for Plaintiff's known pregnancy-related medical conditions and limitations, ultimately terminating her due to these conditions, in violation of the Pregnant Workers Fairness Act (PWFA), Americans with Disabilities Act (ADA), and Washington Law Against Discrimination (WLAD)?

Rule:

The Pregnant Workers Fairness Act (PWFA), 42 U.S.C. § 2000gg, effective June 27, 2023, mandates that covered entities provide reasonable accommodations to a qualified employee's known limitations related to pregnancy, childbirth, or related medical conditions, unless the accommodation would impose an undue hardship on the employer's business. Similarly, the Americans with Disabilities Act (ADA), 42 U.S.C. § 12112, requires covered employers to provide reasonable accommodations to qualified individuals with disabilities, which can include pregnancy-related conditions if they constitute a "physical or mental impairment that substantially limits one or more major life activities." The Washington Law Against Discrimination (WLAD), RCW 49.60.180, also prohibits discrimination based on pregnancy and requires employers to provide reasonable accommodations for pregnancy-related conditions, treating them as temporary disabilities.

To establish a prima facie case of failure to accommodate, Plaintiff must demonstrate: (1) she had a known limitation related to pregnancy, childbirth, or a related medical condition; (2) she sought an accommodation; (3) Defendants failed to provide a reasonable accommodation; and (4) Defendants took an adverse employment action because of her request for or need for accommodation. *Young v. United Parcel Serv., Inc.*, 575 U.S. 206 (2015) (pre-PWFA framework, still relevant for establishing discrimination based on failure to accommodate); *EEOC Enforcement Guidance on the Pregnant Workers Fairness Act* (EEOC, June 27, 2023). An employer must also engage in an "interactive process" to identify and implement reasonable accommodations.

Analysis:

1. Plaintiff had a known limitation related to pregnancy requiring accommodation

Plaintiff was pregnant in 2023 and developed a high-risk pregnancy with significant medical limitations, specifically requiring reduced work hours and cessation of 24/7 on-call duties to mitigate risks of premature birth and other complications (Facts 37-39, 41). These limitations substantially impacted her ability to perform aspects of her job without accommodation, falling squarely within the protections of the PWFA, and potentially the ADA and WLAD as a temporary disability. As a direct result of the stress imposed by the unaccommodated work environment, including the burdensome on-call duties and hostile managerial conduct, Plaintiff gained zero weight and the fetus shown alarming abnormalities under the management of Xiaotong Zhang (Fact 150.a), and was unable to rest at night due to the combined effects of on-call demands and pregnancy hormone changes.

2. Plaintiff sought accommodation, and defendants had knowledge of the need

Clear and repeated accommodation requests: On May 1, 2023, Plaintiff formally and clearly requested pregnancy-related reasonable accommodations through multiple written communications to Warner Bros. Discovery's HR specialist, Fannie Moy (Facts 37-39). This request specifically sought removal from 24/7 on-call duties, limiting her work to 40 hours per week (Fact 41). Plaintiff provided a doctor's note supporting these restrictions, which explicitly stated the need for reduced physical and mental stress (Fact 41). These requests were unequivocal and directly communicated the nature of her limitations and the desired accommodation.

Defendants' actual knowledge and hostile response: Defendants had actual knowledge of Plaintiff's pregnancy and the specific limitations requiring accommodation.

HR knowledge: Fannie Moy, as a WBD HR specialist, received Plaintiff's requests directly and was aware of her medical needs (Facts 37-39).

Manager knowledge and hostile conduct: Plaintiff's manager, Xiaotong Zhang, was also aware of Plaintiff's pregnancy and accommodation requests. Zhang later acknowledged learning of Plaintiff's "protected status" from HR on July 21, 2023 (Fact 60), confirming that the information had been disseminated within the company to relevant personnel. Plaintiff had already sensed Zhang's increased aggression towards her (Fact 50, 51), and it was later validated that Zhang's attempt to fabricate negative performance documentation began immediately after Plaintiff's accommodation request (Fact 44). Zhang's subsequent actions, including attempting to find a "legally defensible reason" to fire Plaintiff during her prearranged leave (Fact 73), demonstrate her awareness of Plaintiff's protected status and the accommodation requests, and her hostile intent to avoid accommodation.

Defendants failed to provide a reasonable accommodation and neglected the interactive process

Complete failure to provide any accommodation: Despite Plaintiff's clear and documented requests, Defendants Warner Bros. Discovery and Hannah Lucille (HR Business Partner) utterly failed to provide any reasonable accommodation for her high-risk pregnancy.

No engagement in interactive process and avoidance of contact: WBD's HR, specifically Lucille, failed to engage in the legally required interactive process to discuss, evaluate, or implement potential accommodations. Plaintiff's initial and subsequent inquiries regarding her accommodation were met with silence or evasion (Fact 43). Crucially, HR did not even discuss the accommodation with Plaintiff, and Lucille deliberately avoided contact, including failing to show up for a scheduled meeting with Plaintiff regarding her concerns. This active avoidance of discussion and engagement demonstrates a willful refusal to fulfill their legal obligations. There were no discussions about alternative duties, temporary relief from on-call, or any other modifications to her work environment.

Continued imposition of burdensome duties despite complaints: Plaintiff remained on the demanding 24/7 on-call rotation, which she explicitly requested to be removed from due to medical restrictions (Fact 41). This continued imposition of duties directly contrary to her medical needs demonstrates a willful refusal to accommodate. Zhang falsely claimed that Plaintiff never complained about being on-call 24/7 (Fact 141f). This claim is demonstrably false and misleading; Plaintiff repeatedly requested to be taken off on-call duties, but Zhang repeatedly refused these requests (Facts 41, 63-67). Zhang consistently dismissed these requests with the same excuse later given to the WBD legal team: she "predicted" the on-call burden to be minimum and did not believe it would be imposing or exceed a 40-hour work week (Fact 141m). This constitutes a systematic hostile and oppressive work environment where Plaintiff's legitimate complaints were actively suppressed and dismissed.

**3.Nature of on-call duty: "engaged to wait" vs. "waiting to be engaged"**: The nature of Plaintiff's 24/7 on-call duty was that of being "engaged to wait," a condition legally recognized as compensable working time, rather than merely "waiting to be engaged." This critical distinction further underscores that 24/7 on-call inherently exceeded a 40-hour work week without accommodation, contrary to Zhang's assertions of minimal burden. Multiple engineers on the team and in the wider department confirmed that primary on-call personnel were required to keep their cellphones on and volume up, and be prepared to respond immediately to incidents. This constant state of readiness meant Plaintiff had to find coverage if traveling, in areas with limited cellular reception, or engaged in other personal activities that would restrict rapid response time. The existence of a robust 3-layer escalation policy, which alerts everyone on the team and can escalate to the entire organization if the primary on-call person fails to respond, demonstrates the urgency and constant nature of the alerts. Alerts had multiple notification methods, including Slack pings, phone text messages, and phone calls, repeating until acknowledged, all indicative of a restrictive "engaged to wait" status. As current engineers analogously put it, WBD could not reasonably contract out such on-call duty and pay only by the number of incidents rather than by time, confirming its nature as continuous work.

Managerial obstruction and lack of credibility: Xiaotong Zhang's conduct further highlights WBD's failure to accommodate and demonstrates Zhang's bad faith.

Contradictory behavior and lack of familiarity with on-call duties: Despite Zhang's claim that on-call duties were minimal, she herself never put herself on-call or on the escalation policy (Fact 33), unlike managers on other teams who participated in primary on-call rotation. Furthermore, Zhang exhibited a profound lack of basic technical knowledge or skills related to on-call management, stating she was "struggle-bussing" to perform simple tasks like overriding on-call schedules after more than 1.5 years on the team (Fact 33.b, 33.c). This directly undermines her credibility regarding the true burden of on-call duties and exposes her claim of "minimal burden" as a pretext to deny accommodation. It is clear that Zhang was not fit to be a manager in the first place, lacking both the necessary experience and technical skills to adequately supervise the team or understand the true demands of the role. Her trivialization of others' work and efforts (Fact 150.f) created an environment where legitimate concerns were dismissed and unaddressed.

Active hostility to leave and demands to work while traveling: Zhang aggressively responded to Plaintiff's requests for on-call coverage during a pre-planned Canadian vacation, demanding Plaintiff arrange coverage at midnight on a Sunday (Facts 63-67). Most egregiously, Zhang directed Plaintiff to work "offline on the airplane" to address work issues during her approved leave, demonstrating an utter disregard for Plaintiff's health, approved leave, and the concept of reasonable accommodation. This behavior directly contradicts any notion of accommodating Plaintiff's health, even for approved leave, and highlights the company's failure to enforce accommodation policies.

Deliberate falsification of on-call history and willful concealment of facts: Further demonstrating her bad faith, attempts to conceal the true burden of on-call duties, and a willful concealment of facts consistent with their other behaviors, Zhang deliberately falsified the on-call history by removing the record of Plaintiff covering for Andrew Sun's personal engagement, specifically the shift from 2023-05-25T22:00:24.000Z (UTC) to 2023-05-26T22:00:00.000Z (UTC) for "Personalization Primary" (Fact 141.m). This specific instance of on-call coverage, removed from Xiaotong Zhang's Declaration, directly contradicts Zhang's claims of minimal on-call demands and underscores that on-call duty significantly restricted personal activities, making accommodation essential. Furthermore, all alert records related to on-call incidents had been destroyed by WBD when they switched the on-call platform from Splunk On-Call to PagerDuty (Fact 149.a, 149.c), which occurred soon after legal preservation notices for Plaintiff's case in 2024 (Fact 149.b). This deliberate destruction of crucial evidence related to on-call

frequency and intensity constitutes spoliation, indicating a consciousness of guilt and an attempt to conceal the true nature and burden of the on-call duties.

Hannah Lucille's specific liability and systematic HR failure: Hannah Lucille, as the HR Business Partner responsible for handling Plaintiff's complaints and accommodations, bears direct responsibility for WBD's failure to accommodate.

Systematic failure of HR due diligence: Lucille's actions, or inactions, reveal a systematic failure of HR due diligence within WBD. HR, including Lucille, allowed an entry-level manager like Xiaotong Zhang, who lacked the necessary experience and technical skills, to effectively dictate and change company policy by repeatedly denying a reasonable accommodation that was previously granted and legally required. This systematic uncompliance by WBD enabled Zhang's discriminatory conduct.

Refusal to investigate: Lucille refused to investigate Plaintiff's discrimination complaints and accommodation requests, stating that WBD could not "substantiate" them despite overwhelming documentary evidence provided by Plaintiff (Fact 112). This demonstrates a deliberate disregard for her duties and Plaintiff's rights.

Sham internal investigation: Lucille participated in a sham internal investigation, refusing severance negotiations contingent on Plaintiff's cooperation with this investigation (Facts 94-96). Her actions, including actively avoiding contact with Plaintiff, indicate a concerted effort to dismiss Plaintiff's claims rather than resolve them through legitimate accommodation or investigation.

4. Adverse employment action was taken because of the accommodation request and need.

The most significant adverse employment action, Plaintiff's termination on September 13, 2023 (Fact 80), occurred directly after her repeated requests for accommodation and after Zhang began fabricating performance documentation in direct temporal proximity to these requests (Fact 44). The causal connection is clear: Defendants failed to provide the requested accommodations and instead used the opportunity of Plaintiff's pregnancy and need for accommodation as a pretext to terminate her employment. The termination effectively denied Plaintiff the ability to continue her employment while pregnant and healthy.

5. Defendants cannot establish undue hardship; disparate treatment demonstrates pretext and systematic uncompliance

Defendants cannot credibly claim that accommodating Plaintiff's pregnancy-related limitations would have imposed an "undue hardship."

     1. Prior successful accommodation for the same condition: In 2021, during a previous pregnancy, Plaintiff requested the exact same accommodation (removal from 24/7 on-call duties) by emailing the same HR person, Fannie Moy. At that time, HR promptly contacted Plaintiff, discussed the 24/7 nature of the on-call schedule and the requirement to work during the day, and immediately removed her from on-call duties, stating that such a schedule would violate company policy. The key difference was the manager at the time was Yi, not Xiaotong Zhang. This direct precedent demonstrates that WBD could and did accommodate this exact request without undue hardship when managed by a different individual.

     2. Feasibility of accommodation: The accommodation requested—removal from 24/7 on-call duties and limiting work to 40 hours—was entirely feasible. Zhang herself was exempt from on-call duties (Fact 33), demonstrating that the company could operate with a manager not on call. Moreover, Zhang's later perjurious claims to the EEOC that on-call duties were minimal and "auto-resolve within

10-15 minutes" (Fact 141m) ironically prove that the requested accommodation would not have been an undue hardship. If on-call duties were truly so light and as Xiaotong Zhang stated that she could confidently predict the future, relieving Plaintiff would have had negligible impact on business operations and Plaintiff would have no motivation to ask to be taken off the on-call rotation in the first place. Zhang's demonstrated inability to perform basic on-call management tasks further highlights the disconnect between her claims of minimal burden and the reality of the role.

    3. Immediate hiring of new staff: Within one week of Plaintiff's termination, eight new employees were added to the Personalization team, including at least one Staff Engineer II (Fact 23). This demonstrates that WBD had the resources and staffing flexibility to absorb Plaintiff's duties or accommodate her, negating any claim of undue hardship due to lack of personnel.

    4. Pretextual justifications: WBD's shifting and fabricated reasons for termination ("job elimination," "low performance," "$5 billion restructuring") (Fact 135a), along with the systematic destruction of evidence (Facts 146-149), further indicate that the failure to accommodate was not due to genuine hardship but discriminatory intent. The stark difference in WBD's response to the same accommodation request under different managers (Yi vs. Zhang) strongly points to Zhang's personal animus and WBD's complicity as the true reason for the denial and subsequent termination, symptomatic of a systematic uncompliance with its legal obligations and internal policies.

The culmination of these actions—Zhang's clear discriminatory intent, HR's consistent refusal to conduct due diligence or intervene, and the active suppression and destruction of evidence—points directly to a profound company-wide mismanagement. WBD's internal systems failed to ensure compliance with its own policies and legal obligations, demonstrating a reckless disregard for Plaintiff's rights and enabling oppressive and malicious conduct. This abdication of responsibility by HR allowed an entry-level manager driven by personal bias and animus to override established company policy and precedent, effectively permitting her to dictate corporate policy and run the company as if it were her own, thereby demonstrating a systemic organizational breakdown and fraudulent concealment of material facts.

Conclusion:

Defendants Warner Bros. Discovery and Hannah Lucille are jointly and severally liable for unlawful failure to accommodate under the Pregnant Workers Fairness Act, the Americans With Disabilities Act, and the Washington Law Against Discrimination. Plaintiff had a known pregnancy-related limitation, clearly communicated her need for accommodation, and Defendants, through their HR representatives and management, knowingly and deliberately refused to engage in the interactive process or provide any reasonable accommodation. Instead, they terminated Plaintiff's employment because of her protected status and need for accommodation. This failure was not due to undue hardship but was a deliberate discriminatory action, further evidenced by Zhang's hostile behavior, the immediate fabrication of documents after the accommodation request, Zhang's perjurious testimony regarding on-call duties despite her own lack of participation and knowledge, HR's active avoidance of discussion and contact and systematic failure of due diligence, the systematic refusal of Plaintiff's repeated complaints, the demand to work while on an airplane, the deliberate falsification of on-call history and subsequent destruction of alert records constituting willful concealment of facts, the nature of the on-call duty as "engaged to wait," the stark contrast with a prior successful accommodation for the same condition, and WBD's subsequent termination of Plaintiff shortly after her accommodation request. This willful, malicious, oppressive, and fraudulent conduct warrants substantial relief including compensatory damages, punitive damages, and attorney fees.

COUNT IV
HOSTILE WORK ENVIRONMENT
(RCW §49.60)
(Against Warner Bros. Discovery, Zhang)


Issue:

Did Defendants Warner Bros. Discovery, Inc. (WBD) and Xiaotong Zhang subject Plaintiff to a hostile work environment based on her sex and pregnancy, creating an abusive working atmosphere in violation of the Washington Law Against Discrimination (WLAD)?

Rule:

To establish a hostile work environment claim under WLAD, Plaintiff must demonstrate: (1) the harassment was unwelcome; (2) the harassment was based on sex or pregnancy; (3) the harassment affected the terms or conditions of employment; and (4) the harassment was imputable to the employer. Harassment affects the terms or conditions of employment when it is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Glasgow v. Georgia-Pacific Corp.*, 103 Wn.2d 492, 494, 693 P.2d 708 (1985). The conduct must be both objectively and subjectively offensive. The employer is liable if it knew or should have known of the harassment and failed to take prompt and effective remedial action.

Analysis:

1. Unwelcome Harassment Based On Sex And Pregnancy

Plaintiff was subjected to unwelcome harassment explicitly based on her sex and pregnancy, primarily perpetrated by Defendant Xiaotong Zhang. This harassment manifested as a pattern of demeaning, isolating, and discriminatory conduct that intensified following Plaintiff's pregnancy announcement and requests for accommodation.

    1. Direct Ridicule and Humiliation: Xiaotong Zhang engaged in a consistent pattern of public ridicule and humiliation. On June 14, 2023, during a daily standup meeting, Zhang publicly ridiculed and humiliated Plaintiff in front of her colleagues, laughing and calling her a "robot" (Fact 50). This was a direct verbal insult, and while Plaintiff attempted to smooth over the awkwardness, the conduct was unwelcome and objectively demeaning. This was not an isolated incident but part of a "consistent pattern of derisive behavior" by Zhang (Fact 50). Furthermore, Zhang has been observed publicly humiliating other engineers. Specifically, after Plaintiff's termination and the filing of her EEOC complaint, a current engineer reported that Zhang "发飙" (lashed out/went ballistic) and publicly humiliated a male colleague who was unable to defend himself. This incident was reported to higher management, yet no action was taken, demonstrating a pervasive pattern of demeaning conduct in the workplace that extended beyond Plaintiff and continued unchecked by WBD.

    2. Targeted Hostility Towards Female Engineers and Dismissive Behavior: Zhang exhibited a documented pattern of hostile treatment specifically targeting female engineers (Fact 145.a). Current and former female employees described Zhang's management style as "sly and cunning" and cited "repeated instances of manipulative behavior toward female team engineers" (Fact 143.e). One female colleague shared that Zhang denied her request for flexible time off to visit parents, calling it "excessive," while

approving similar requests from male colleagues (Fact 143.a, 143.b, 143.j, 143.k). This disparate treatment created a work environment where female employees, including Plaintiff, were subjected to a different, more hostile standard. Notably, even after Plaintiff's termination and the filing of an EEOC complaint, Zhang continued to foster a hostile environment. When another female engineer recently performed exceptionally well in a design document representation, Xiaotong Zhang responded with overt arrogance and dismissal, directly undermining a female subordinate's achievement and demonstrating a persistent pattern of demeaning behavior that WBD failed to mitigate.

3. Isolation and Exclusion: Following Plaintiff's pregnancy announcement and accommodation requests, Zhang deliberately isolated Plaintiff from team communications and withheld critical project information (Fact 51). There was no verbal or written communication between Zhang and Plaintiff for nearly a month (June 13 to July 11, 2023), despite Plaintiff attempting to engage Zhang on work-related matters (Fact 51). This isolation was a form of harassment, designed to undermine Plaintiff's professional standing and contribution.

4. Fabrication of Performance Documentation: Zhang systematically fabricated negative performance documentation immediately following Plaintiff's pregnancy accommodation request (Fact 44). This deliberate creation of false records, backdating entries for meetings that never occurred (Facts 44, 61), was a direct and malicious attack on Plaintiff's professional reputation and an attempt to create a pretext for her eventual termination. This ongoing falsification contributed significantly to an abusive environment.

4. Aggression and Demands Regarding Leave: Zhang's aggressive response to Plaintiff's pre-planned Canadian vacation, demanding immediate on-call coverage and requiring Plaintiff to arrange it at midnight on a Sunday (Facts 63-67), and her instruction for Plaintiff to work "offline on the airplane" (Fact 66), directly demonstrated hostility towards Plaintiff's personal and medical needs. This conduct, coupled with Zhang's warning against taking future leave for medical reasons (Fact 73), created an environment where Plaintiff felt penalized for her protected activities and health needs.

2. Severe Or Pervasive Conduct Affecting Terms And Conditions Of Employment

The harassment was sufficiently severe and pervasive to alter the conditions of Plaintiff's employment and create an objectively and subjectively abusive working environment. The cumulative effect of Zhang's ridicule, isolation, systematic fabrication of performance issues, and hostile demands regarding leave was not merely offensive but fundamentally undermined Plaintiff's ability to perform her job free from discriminatory intimidation and interference. The continuation of this behavior towards other engineers, even after Plaintiff's departure and formal complaint, demonstrates the pervasive nature of the hostile environment created by Zhang and tolerated by WBD.

1. Psychological Impact: The constant stress, humiliation, and fear of retaliation directly impacted Plaintiff's health, leading to zero weight gain during her pregnancy and an inability to rest at night (Fact 150.a). This physiological response is direct evidence of the severe impact of the hostile environment. Plaintiff was later diagnosed with Adjustment Disorder with Mixed Anxiety and Depressed Mood, progressing to Trauma and Stressor-Related Disorder (Fact 150).

2. Undermining Professional Standing: Zhang's actions, including public ridicule and the fabrication of performance records, directly aimed to undermine Plaintiff's professional standing and credibility within the team and company. This created an environment of professional insecurity and distress.

    3. Systematic Nature: The harassment was not an isolated incident but a systematic pattern of behavior, particularly intensifying after Plaintiff's pregnancy announcement. The consistency of Zhang's discriminatory actions against Plaintiff and other female engineers demonstrates a pervasive hostile environment, one that WBD demonstrably failed to correct.

3. Imputability To The Employer (Warner Bros. Discovery)

The hostile work environment is directly imputable to Warner Bros. Discovery due to its knowledge of the harassment and its failure to take prompt and effective remedial action.

    1. Direct Knowledge and Inaction: WBD, through its HR representatives (Fannie Moy, Hannah Lucille, Patrice Grimes), had direct knowledge of Zhang's conduct and Plaintiff's complaints of discrimination and harassment (Facts 38, 89, 106, 112). Plaintiff formally filed a complaint of "Pregnancy Discrimination" on September 21, 2023 (Fact 89), and provided extensive evidence of Zhang's fabricated documentation and disparate treatment (Fact 106).

    2. Failure to Investigate and Remediate and Failure to Mitigate: Despite receiving formal complaints and compelling evidence, WBD's HR, particularly Hannah Lucille, failed to conduct a proper investigation, actively avoided contact with Plaintiff (Fact 39, 87), and ultimately concluded that Plaintiff's claims could not be "substantiated" (Fact 112). This constitutes a failure to take prompt and effective remedial action. Instead of addressing the harassment, WBD engaged in a "sham internal investigation" (Fact 96) and allowed Zhang's conduct to continue unaddressed. The continued instances of Zhang's public humiliation and dismissive behavior towards other engineers, including incidents reported to higher management after Plaintiff's termination and the EEOC filing, unequivocally demonstrate WBD's profound failure to mitigate the hostile environment and ensure a safe workplace. This protracted inaction indicates a corporate endorsement of the discriminatory conduct and a systemic disregard for employee well-being.

    3. Company-Wide Mismanagement and Endorsement of Hostility: WBD's systematic failure of HR due diligence, as detailed in Count III, allowed an unqualified manager like Zhang to operate with impunity, effectively dictating policy and creating a discriminatory environment (Facts 143.f, 145.e). The company's subsequent efforts to conceal evidence and provide false information to the EEOC (Facts 134, 141, 146-149) demonstrate not merely a failure to act, but an endorsement of the hostile environment created by Zhang. The fact that other employees noted "no one wants to work in Xiaotong Zhang's team" and that "the company is poorly managed" (Fact 145.e) underscores a broader organizational failure to address and prevent such conduct.

Conclusion:

Defendants Warner Bros. Discovery and Xiaotong Zhang are jointly and severally liable for subjecting Plaintiff to a hostile work environment based on her sex and pregnancy. Zhang's pervasive and severe conduct, including public ridicule of Plaintiff and other colleagues, deliberate isolation, systematic fabrication of performance records, and hostile demands regarding leave, created an objectively and subjectively abusive working environment. WBD's direct knowledge of this harassment, coupled with its systematic failure to investigate, remediate, and its active efforts to conceal evidence and failure to mitigate the ongoing hostile environment, demonstrates its complicity and direct liability. This conduct warrants substantial relief including compensatory damages, punitive damages, and attorney fees.

COUNT V
WRONGFUL TERMINATION AND VIOLATION OF PUBLIC POLICY
Washington Common Law
(Against Warner Bros. Discovery, Devkar)

Issue:

The central issue is whether Defendants Warner Bros. Discovery, Inc. and Deepna Devkar wrongfully terminated Plaintiff's employment in contravention of clear mandates of public policy, specifically by: terminating her in retaliation for exercising her statutory rights related to pregnancy and accommodation, orchestrating a pretextual termination disguised as a reduction in force while failing to comply with mandatory WARN Act notification requirements, and utilizing fabricated performance documentation to justify a discriminatory termination. This also extends to the violation of public policy against obstruction of justice and systematic evidence destruction.

Rule:

Under Washington common law, an employer may not terminate an employee for reasons that violate a clear mandate of public policy. *Gardner v. Loomis Armored Inc.*, 128 Wn.2d 931, 913 P.2d 377 (1996). This public policy exception to at-will employment protects employees from discharge when the dismissal frustrates the fulfillment of a statutory duty or the exercise of a statutory right, is for reporting illegal activity, or is for refusing to commit an illegal act. Clear mandates of public policy are typically found in statutes, constitutional provisions, or administrative rules.

Washington State and federal laws establish clear public policy mandates that employees be free from discrimination based on pregnancy and sex (Title VII, 42 U.S.C. § 2000e; WLAD, RCW 49.60.180), from retaliation for requesting reasonable accommodations or opposing unlawful practices (Title VII, 42 U.S.C. § 2000e-3; WLAD, RCW 49.60.210), and from discrimination for exercising rights under disability accommodation laws, including the Pregnant Workers Fairness Act (PWFA, 42 U.S.C. § 2000gg) and Americans with Disabilities Act (ADA, 42 U.S.C. § 12112).

Furthermore, the Worker Adjustment and Retraining Notification Act (WARN Act), 29 U.S.C. § 2101 et seq., and Washington State's corresponding Mini-WARN Act, RCW 49.65, establish clear public policy requiring employers to provide advance notice to employees and government agencies before conducting mass layoffs or plant closures. There is also an implicit, fundamental public policy against the spoliation of evidence and obstruction of justice, which is essential to the integrity of legal proceedings.

To establish a claim for wrongful termination in violation of public policy, a plaintiff must demonstrate: (1) the existence of a clear public policy; (2) that discouraging the conduct in which the plaintiff engaged would jeopardize the policy; (3) that the policy-linked conduct caused the dismissal; and (4) that the employer lacked overriding justification for the dismissal. *Korslund v. DynCorp Tri-Cities Services, Inc.*, 156 Wn.2d 168, 125 P.3d 119 (2005).

Analysis:

1. Clear Public Policy Exists

Multiple clear mandates of public policy underpin Plaintiff's claim, deriving from both statutory law and fundamental principles of justice:

1. Pregnancy and Sex-Based Anti-Discrimination and Accommodation Rights: Federal and Washington State laws, including Title VII, the Pregnancy Discrimination Act, the Americans with Disabilities Act, and the Pregnant Workers Fairness Act, unambiguously establish public

policy protecting pregnant employees from discrimination, requiring reasonable accommodations, and prohibiting retaliation for requesting such accommodations.
2. Anti-Retaliation Protections: Public policy, as codified in Title VII and WLAD, strictly prohibits employers from retaliating against employees for engaging in protected activities, such as requesting reasonable accommodations or reporting discriminatory practices.
3. WARN Act Compliance: The federal WARN Act and Washington's Mini-WARN Act embody a clear public policy requiring employers to provide advance notice of mass layoffs, protecting workers and communities from abrupt economic displacement.
4. Integrity of Justice System: Underlying the legal framework is a clear public policy against the obstruction of justice, including the deliberate destruction of evidence, which undermines the fairness and efficacy of legal and administrative proceedings.

## 2. Discouraging Plaintiff's Conduct Would Jeopardize Public Policy

Allowing employers to terminate employees for exercising their pregnancy accommodation rights, or in retaliation for protected activities, would directly undermine public policy safeguarding pregnant workers and promoting a discrimination-free workplace. Such actions would deter employees from asserting their legal rights, rendering statutory protections meaningless.

Similarly, permitting employers to conduct sham layoffs without complying with WARN Act requirements would entirely subvert the protective purpose of worker notification laws, leaving employees vulnerable to sudden job loss without the required advance notice for re-employment planning.

Finally, tolerating the deliberate destruction of evidence and obstruction of investigations would severely jeopardize the public policy favoring fair and transparent legal processes, allowing wrongdoers to evade accountability.

## 3. Policy-Linked Conduct Caused the Dismissal

Plaintiff's termination on September 13, 2023 (Fact 80), was directly caused by her protected conduct and status, and motivated by reasons that contravene clear mandates of public policy. This causation is established through a pattern of pretextual justifications, retaliatory actions, and systematic obstruction.

1. Pretextual Nature of Termination: Defendants' proffered reasons for Plaintiff's termination were demonstrably pretextual.
2. Shifting and Contradictory Rationales: Warner Bros. Discovery offered inconsistent explanations for Plaintiff's termination, initially claiming "job elimination" (Fact 82), then "low performance" (Facts 135f-h), and later a "$5 billion restructuring" (Fact 135a). This pattern of shifting justifications is a hallmark of pretext.
3. Contradictory Hiring: The assertion of "job elimination" is directly refuted by the immediate hiring of eight new employees to Plaintiff's team within one week of her termination (Fact 23).
4. WARN Act Non-Compliance: WBD's failure to issue any WARN Act notices in Washington, New York, or California (Fact 84), despite claiming a large-scale restructuring, exposes the "reduction in force" as a sham and a direct violation of public policy.
5. Fabricated Performance Documentation: The "low performance" rationale relies entirely on falsified records. Xiaotong Zhang systematically began editing Plaintiff's 1:1 performance notes, creating fabricated entries for non-existent meetings, just five hours after Plaintiff submitted her formal reasonable accommodation request on May 18, 2023 (Facts 44, 73). These alterations were deliberate fraud, manufactured to create a false record of deficiencies.
6. Retaliatory Nexus: The timing and nature of Defendant's actions establish a clear causal connection between Plaintiff's protected activities and her termination.

      a. Temporal Proximity: The systematic fabrication of performance documentation by Zhang commenced on the exact same day Plaintiff submitted her accommodation request (May 18, 2023) (Fact 44). Plaintiff's termination occurred within four months of her pregnancy announcement and formal accommodation requests.

      b. Zhang's Admitted Retaliatory Intent: Xiaotong Zhang explicitly admitted to Plaintiff her intent to find a "legally defensible reason" to fire Plaintiff during her approved family leave (Fact 73), unequivocally demonstrating retaliatory animus.

7. Deepna Devkar's Culpability and WBD's Institutional Complicity: Deepna Devkar, as Plaintiff's female skip-skip level manager (Facts 15-17), approved Plaintiff's termination (Fact 80) despite having no direct contact with Plaintiff and no independent knowledge of her work or performance (Fact 18). Devkar's decision was therefore entirely reliant on information funneled through Xiaotong Zhang and Allen Gay, both of whom had discriminatory motives.

      a. Devkar had actual knowledge of Plaintiff's pregnancy and accommodation requests via email in May 2023 (Fact 38).

      b. She participated in the internal review process that negligently dismissed Plaintiff's valid discrimination complaints (Fact 112).

      c. Devkar further compounded the violation of public policy by providing demonstrably false information to the EEOC, asserting that Plaintiff's termination was due to "job elimination" and that no open positions were available (Fact 134.g), a claim directly contradicted by WBD's subsequent hiring spree (Fact 23). This demonstrates Devkar's active participation in the fabricated narrative and concealment of the true discriminatory reasons.

8. Systematic Obstruction of Justice and Spoliation of Evidence: Defendants engaged in a deliberate pattern of evidence destruction and obstruction, reflecting a consciousness of guilt and a direct violation of public policy.

      a. Destruction of Critical Records: WBD implemented a 180-day email deletion policy and migrated on-call logs to PagerDuty after litigation hold was imposed (Facts 146-149), thereby eliminating historical records relevant to Plaintiff's claims, including those refuting Zhang's false testimony about on-call duties (Fact 141f, 141m).

      b. Targeted Deletion of Protected Activity Documentation: WBD deleted records of Plaintiff's FMLA claim and short-term disability application (Fact 76), indicating a direct attempt to erase evidence related to her protected status.

      c. Deliberate Destruction of Edit Histories: Despite Plaintiff providing WBD with actual knowledge of the falsified Google Doc and the probative value of its edit histories during an internal investigation (Fact 133), WBD subsequently revoked employee access to Google Drive and migrated documents to OneNote *without preserving edit histories* (Fact 134), thereby destroying critical digital forensic evidence of Zhang's systematic falsification.

9. Obstruction of Investigations: Zhang's perjurious testimony to the EEOC, including false claims about document review and employment timelines (Facts 134b-d), actively obstructed a federal civil rights investigation, constituting a separate violation of federal law and further evidencing discriminatory intent and a pattern of bad faith.

### 4. Defendant Lacked Overriding Justification

Defendants entirely lacked any legitimate, non-discriminatory, or overriding justification for Plaintiff's termination.

1. Fabricated Performance Issues: The performance issues alleged by Zhang were created and backdated after Plaintiff's accommodation requests (Fact 44), lacking any genuine basis.

2. Excellent Work History: Plaintiff had a stellar employment record with no prior write-ups or negative evaluations before her pregnancy announcement, consistently earned performance-based bonuses, and was a key contributor to critical HBO Max features (Facts 5-8, 11).

3. Absence of Business Necessity: The failure to comply with WARN Act requirements and the immediate hiring of new employees contradict any claim of legitimate business necessity for the termination.

4. Discriminatory Pattern: The termination was an integral part of a broader pattern of discriminatory treatment by Zhang against female engineers, including public humiliation, denial of accommodation, and disparate treatment compared to male colleagues (Fact 50, 143a, 143b, 143j, 143k).

Conclusion:

Defendants Warner Bros. Discovery, Inc. and Deepna Devkar wrongfully terminated Plaintiff in flagrant violation of Washington State public policy. This termination was a direct consequence of Plaintiff's exercise of her statutory rights under pregnancy discrimination and accommodation laws, orchestrated through a pretextual "reduction in force," reliance on fabricated performance documentation, and a systematic campaign of retaliation. The conduct, particularly Deepna Devkar's approval of a decision based on tainted information and WBD's deliberate spoliation of evidence and obstruction of justice, represents a profound disregard for fundamental public policy mandates. As a direct and proximate result of Defendants' wrongful and unlawful conduct, Plaintiff has suffered and continues to suffer significant damages, including lost wages, lost benefits, severe emotional distress, damage to her professional reputation, and other economic and non-economic losses.

COUNT VI
COBRA VIOLATION
29 U.S.C. § 1166
(Against Against Warner Bros. Discovery)

Issue:

Whether Defendant Warner Bros. Discovery, Inc. (WBD) violated the Consolidated Omnibus Budget
Reconciliation Act (COBRA), 29 U.S.C. § 1166, by failing to provide Plaintiff with timely and proper
notice of her right to continue health coverage following her termination on September 30, 2023, and by
retroactively canceling her health insurance without proper notification, causing significant harm during
her high-risk pregnancy.

Rule:

1.  Under COBRA, 29 U.S.C. § 1166(a)(4), an employer must notify a qualified beneficiary, such as
    a terminated employee, of their right to elect continuation coverage under a group health plan
    within 44 days of a qualifying event, such as termination of employment, as specified in 29
    U.S.C. § 1163(2). The notice must be provided in a manner calculated to be understood by the
    average plan participant, as required by 29 C.F.R. § 2590.606-4(b).
2.  The notice must include specific information, such as the right to elect coverage, the duration of
    coverage (typically 18 months), and payment responsibilities, and must be sent to the employee's
    last known address. Failure to provide timely notice constitutes a violation of COBRA, entitling
    the employee to damages, including statutory penalties of up to $110 per day for each day of
    non-compliance, medical expenses incurred, and other equitable relief. 29 U.S.C. § 1132(c)(1); 29
    C.F.R. § 2575.502c-1.
3.  Retroactive cancellation of health coverage without proper COBRA notice violates the
    Affordable Care Act's requirements (42 U.S.C. § 300gg-15) and COBRA's prohibition on
    rescission without fraud or misrepresentation (45 C.F.R. § 147.128). Employees must receive at
    least 30 days' notice before coverage cancellation, except in cases of fraud or intentional
    misrepresentation, which are not applicable here.
4.  To establish a COBRA violation, a plaintiff must show: (1) they were a qualified beneficiary
    under a group health plan; (2) a qualifying event occurred (e.g., termination); (3) the employer
    failed to provide timely and proper COBRA notice; and (4) the failure caused harm, such as loss
    of coverage or incurred medical expenses. *See DeVoll v. Burdick Painting, Inc.*, 35 F.3d 408 (9th
    Cir. 1994).

Analysis:

1.  Qualified Beneficiary and Qualifying Event: Plaintiff was a qualified beneficiary under WBD's
    group health plan as a full-time employee from September 16, 2019, until her termination on
    September 30, 2023 ( Fact 1). Her termination constituted a qualifying event under 29 U.S.C. §
    1163(2) ( Fact 80 82).
2.  Failure to Provide Timely and Proper COBRA Notice: Defendant WBD failed to provide Plaintiff
    with the required COBRA notice within 44 days of her termination on September 30, 2023, or at
    any time prior to January 5, 2024 ( Fact 100). On January 5, 2024, WBD's Employee Connection
    informed Plaintiff that her coverage was retroactively canceled effective September 30, 2023,
    because she did not sign the severance agreement, and stated that a COBRA offer was generated,
    which Plaintiff had not yet received ( Fact 126). This failure to provide notice within the statutory
    period violates 29 U.S.C. § 1166(a)(4).

3. Retroactive Cancellation Without Proper Notice: WBD retroactively canceled Plaintiff's health insurance effective September 30, 2023, without providing the required 30-day notice under 45 C.F.R. § 147.128 or any prior notification ( Fact 122). This cancellation occurred 48 hours before Plaintiff's scheduled cesarean section, during a high-risk pregnancy with multiple medical conditions that substantially limited major life activities ( Fact 37 122). The retroactive cancellation was not based on fraud or misrepresentation, rendering it unlawful under COBRA and the Affordable Care Act ( Fact 122).

4. Harm Caused by Violation: The failure to provide timely COBRA notice and the retroactive cancellation caused Plaintiff significant harm. On January 2 and 3, 2024, Plaintiff made multiple calls to the hospital, medical providers, WBD's benefits center, and insurance to resolve the coverage issue, incurring stress and financial uncertainty ( Fact 123 124). On January 5, 2024, the hospital billing center demanded payment due to the retroactive cancellation, exacerbating Plaintiff's distress ( Fact 127). Plaintiff was discharged from the hospital within 48 hours of her cesarean section, compared to a five-day stay for a prior similar surgery, due to the lack of coverage ( Fact 128). These events contributed to Plaintiff's diagnosis of Adjustment Disorder with Mixed Anxiety and Depressed Mood in late 2023, progressing to Trauma and Stressor-Related Disorder by early 2025, directly linked to the insurance cancellation ( Fact 150a).

5. Defendant's Bad Faith and Pretextual Conduct: WBD's failure to provide COBRA notice was part of a broader pattern of misconduct, including retroactive cancellation of Plaintiff's health insurance without notice ( Fact 122), failure to deposit premiums for dependent care and life insurance despite Plaintiff's continued payments from October 1 to December 31, 2023 ( Fact 109), and falsified claims in its EEOC response about Plaintiff's termination ( Fact 135). The lack of COBRA notice, combined with WBD's destruction of evidence, such as emails and on-call logs ( Fact 146 149), suggests bad faith and an intent to obscure discriminatory practices, further aggravating the harm to Plaintiff.

Conclusion:

Defendant Warner Bros. Discovery, Inc. violated COBRA, 29 U.S.C. § 1166, by failing to provide Plaintiff  with timely and proper notice of her right to continue health coverage following her termination on September 30, 2023, and by retroactively canceling her health insurance without proper notification, in violation of 42 U.S.C. § 300gg-15 and 45 C.F.R. § 147.128. These violations caused Plaintiff significant financial and emotional harm, particularly during her high-risk pregnancy, including medical expenses, stress, and a shortened hospital stay. Plaintiff is entitled to statutory penalties of up to $110 per day from October 1, 2023, until the date of proper COBRA notice, compensation for medical expenses incurred, emotional distress damages, and other equitable relief as permitted by 29 U.S.C. § 1132(c)(1).

COUNT VII
INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
Washington Tort Law
(Against Warner Bros. Discovery, Zhang)

Issue:

Whether Defendants Warner Bros. Discovery, Inc. (WBD) and Xiaotong Zhang, acting as a managing agent, intentionally or recklessly inflicted severe emotional distress on Plaintiff through extreme and outrageous conduct, including fabricating performance documentation, lying under penalty of perjury to the EEOC, deliberately misrepresenting organizational details to conceal discrimination, publicly humiliating Plaintiff, denying pregnancy-related accommodations, retroactively canceling her health insurance during a high-risk pregnancy, and breaching the Restricted Stock Unit (RSU) Grant Agreement by canceling 1,902 shares without notification, with WBD's legal counsel colluding with Zhang in a pattern of bad faith, resulting in diagnosed psychological harm.

Rule:

1. Under Washington tort law, intentional infliction of emotional distress (IIED), also known as the tort of outrage, requires a plaintiff to prove: (1) the defendant engaged in extreme and outrageous conduct; (2) the conduct was intentional or reckless; (3) the conduct caused severe emotional distress; and (4) the distress was objectively severe. *Grimsby v. Samson*, 85 Wn.2d 52, 530 P.2d 291 (1975); *Reid v. Pierce County*, 136 Wn.2d 195, 961 P.2d 333 (1998).

2. Extreme and outrageous conduct is that which is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Dicomes v. State*, 113 Wn.2d 612, 782 P.2d 1002 (1989). Conduct in the employment context, such as targeted discrimination, retaliation, humiliation, deliberate misrepresentation to federal agencies, or breach of contractual obligations exploiting a plaintiff's vulnerabilities (e.g., pregnancy), may rise to this level. *Robel v. Roundup Corp.*, 148 Wn.2d 35, 59 P.3d 611 (2002).

3. An employer and its managing agents are liable for IIED if their actions meet the requisite standard. A managing agent is an employee with significant authority to make or influence decisions affecting corporate policy or personnel actions, such as terminations, whose conduct binds the employer under respondeat superior. *Thompson v. Everett Clinic*, 71 Wn. App. 548, 860 P.2d 1054 (1993). Providing false evidence, lying under penalty of perjury, or deliberately misrepresenting facts to mislead a federal agency, such as the EEOC, constitutes outrageous conduct and aggravates corporate liability when ratified or inadequately investigated. *See Johnson v. Dep't of Soc. & Health Servs.*, 80 Wn. App. 212, 907 P.2d 1223 (1996).

4. Corporate liability extends to failures to conduct due diligence, such as verifying organizational charts or investigating false claims, when such failures enable discriminatory or retaliatory conduct, particularly for a large employer with substantial resources. Deliberate misrepresentation of basic facts to conceal discrimination demonstrates bad faith, further supporting IIED liability. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998).

5. Severe emotional distress must be more than transient or trivial, often evidenced by medical diagnoses or significant life disruptions. *Kloepfel v. Bokor*, 149 Wn.2d 192, 66 P.3d 630 (2003).

Analysis:

1. Extreme and Outrageous Conduct: Defendants WBD and Xiaotong Zhang engaged in extreme and outrageous conduct through a pattern of discriminatory, retaliatory, and contract-breaching actions

targeting Plaintiff during her high-risk pregnancy. Following Plaintiff's May 1, 2023, accommodation request to be removed from 24/7 on-call duties due to medical restrictions (Fact 38), Zhang fabricated performance documentation, including backdated 1:1 notes on May 18, June 1, June 13, July 13, July 21, and September 6, 2023, often without corresponding meetings (Facts 44, 48, 61, 77). On June 14, 2023, Zhang publicly humiliated Plaintiff by calling her a "robot" during a team meeting, causing Plaintiff to drop off the call in distress (Fact 50). Zhang unfairly criticized Plaintiff for issues outside her responsibility on September 7, 2023, covering up errors by another engineer, Shuo Li, who did not report to her (Fact 79). On July 21, 2023, Zhang consulted HR about terminating Plaintiff for "work abandonment" during pre-arranged leave, despite Plaintiff's coordination of on-call coverage (Facts 60, 73). WBD exacerbated this conduct by retroactively canceling Plaintiff's health insurance effective September 30, 2023, without notice, 48 hours before her scheduled cesarean section, leaving her to face hospital billing demands and a shortened hospital stay (Facts 122, 127, 128). Additionally, between September 30, 2023, and December 29, 2024, WBD canceled a restricted stock unit (RSU) grant of 1,902 shares, originally awarded on March 1, 2023, without providing notification, violating the terms of the Restricted Stock Unit Grant Agreement executed on March 23, 2023, and the WarnerMedia U.S. Severance Plan handbook received on September 13, 2023 (Fact 121). These actions, targeting Plaintiff's known vulnerabilities as a pregnant employee with medical complications (Facts 37, 45), are atrocious and beyond the bounds of decency.

2. Zhang as Managing Agent and False Evidence: Zhang acted as a managing agent for WBD, wielding significant influence over Plaintiff's termination decision and providing false evidence to mislead the EEOC. As Plaintiff's direct manager, Zhang was the primary source of performance information relied upon by WBD's legal counsel in their March 20, 2024, EEOC response, which falsely claimed Plaintiff was a "low performer" (Facts 135, 137). Zhang's fabricated 1:1 notes and internal RIF document annotations (Facts 44, 137) directly informed WBD's pretextual "job elimination" rationale (Fact 82), despite the immediate hiring of eight new PAPI team members post-termination (Fact 23). Zhang's May 5, 2023, praise of Plaintiff's work ("@wrohwer you have the most context on Rocket history!") contradicts her claims (Fact 11). Zhang's lies about Plaintiff's performance and leave, including alleging "work abandonment" (Fact 73), were not independently verified by WBD, despite Plaintiff's four-year record of exceeding expectations, leading critical HBO Max features, and mentoring staff (Facts 5, 8).

3. WBD's Collusion and Deliberate Misrepresentation: WBD's legal counsel colluded with Zhang by uncritically relying on her falsified records and declaration to defend against Plaintiff's EEOC charge (Facts 135, 141), despite contradictions with Plaintiff's documented performance (Facts 5, 11). WBD's counsel deliberately misrepresented to the EEOC that Zhang managed six engineers, including Shuo Li as an additional female engineer, to obscure Zhang's discriminatory conduct toward female employees (Fact 141). However, the organization chart clearly shows Zhang managed only five engineers, and Shuo Li reported to Dan Gur, not Zhang (Fact 17), meaning Zhang had no authority to terminate or evaluate Li. This deliberate concealment of basic organizational facts demonstrates bad faith, consistent with a pattern of misconduct by Zhang and WBD's legal team, including Zhang's false EEOC declaration (Fact 135) and WBD's destruction of evidence, such as emails and on-call logs (Facts 146, 149) and the 1 on 1 performance documentation. WBD's failure to verify the organization chart or other readily available evidence, such as on-call records (Fact 146), reflects either willful collaboration with Zhang's false narrative or reckless indifference to conducting an independent investigation. This failure is particularly egregious for a company with over 35,000 employees (Fact 4), where adherence to internal policies is critical. The cancellation of Plaintiff's 1,902 RSU shares without notification (Fact 121) further evidences this pattern of bad faith, as WBD breached contractual obligations, exacerbating Plaintiff's financial and emotional distress.

4. Intentional or Reckless Conduct: Zhang's actions were intentional or reckless, as evidenced by her deliberate fabrication of performance records post-accommodation request (Fact 44), her consultation with HR to explore termination grounds (Fact 73), her public humiliation of Plaintiff (Fact 50), and her false EEOC declaration (Fact 135). Zhang's pattern of disparate treatment toward female engineers,

denying flexible time off to women while approving it for men (Fact 141a), and her reported "deeply jealous" behavior when subordinates excelled (Fact 141d), demonstrate intent or reckless disregard for Plaintiff's emotional well-being. WBD's retroactive cancellation of Plaintiff's insurance (Fact 122), failure to provide COBRA notice (Fact 100), cancellation of the RSU grant (Fact 121), and deliberate misrepresentation of Zhang's team size to the EEOC (Fact 141) were reckless, as WBD knew or should have known of Plaintiff's high-risk pregnancy (Fact 37) and prior 2021 accommodation (Fact 12), making the impact foreseeably severe. WBD's collusion with Zhang's false narrative, without verifying basic facts, further reflects a pattern of bad faith and reckless indifference to Plaintiff's rights and well-being.

5. Severe Emotional Distress: Defendants' conduct caused Plaintiff severe emotional distress, resulting in a diagnosis of Adjustment Disorder with Mixed Anxiety and Depressed Mood in late 2023, progressing to Trauma and Stressor-Related Disorder by early 2025 (Fact 150). This distress was directly linked to WBD's retroactive insurance cancellation 48 hours before Plaintiff's cesarean section (Fact 150a), Zhang's fabricated performance documentation (Fact 150b), gaslighting during internal investigations (Fact 150c), and the cancellation of the RSU grant, which deprived Plaintiff of significant financial security during a vulnerable period (Fact 121). Plaintiff's distress was compounded by multiple calls to resolve insurance issues (Facts 123, 124), hospital payment demands (Fact 127), and a shortened hospital stay compared to a prior surgery (Fact 128). These disruptions, alongside pregnancy complications (Fact 45), demonstrate objectively severe emotional harm.

Conclusion:

Defendants Warner Bros. Discovery, Inc. and Xiaotong Zhang, acting as a managing agent, intentionally or recklessly inflicted severe emotional distress on Plaintiff  through extreme and outrageous conduct, including fabricating performance documentation, lying under penalty of perjury to the EEOC, deliberately misrepresenting organizational details to conceal discrimination, publicly humiliating Plaintiff, denying pregnancy-related accommodations, retroactively canceling her health insurance during a high-risk pregnancy, and breaching the RSU Grant Agreement by canceling 1,902 shares without notification. WBD's legal counsel colluded with Zhang by relying on her false evidence and misrepresenting Zhang's team size to the EEOC, reflecting a pattern of bad faith that is unconscionable for a company of WBD's scale. This conduct caused severe, medically diagnosed psychological harm, including Adjustment Disorder and Trauma and Stressor-Related Disorder. Plaintiff is entitled to compensatory damages for emotional distress, medical expenses, punitive damages, and other relief as permitted by Washington law.

COUNT VIII
FRAUD AND DEFAMATION
Washington Common Law (RCW 9A.60.020, RCW 9.58.010)
(Against Zhang)

Issue:

Whether Defendant Xiaotong Zhang committed fraud and defamation under Washington common law by fabricating performance documentation and making false statements regarding Plaintiff's work performance and professional conduct.

Rule:

Fraud Elements (Washington Common Law)

Under Washington law, fraud requires proof of:

1. A representation of an existing fact;
2. The materiality of the representation;
3. The falsity of the representation;
4. The speaker's knowledge of its falsity or ignorance of its truth;
5. The speaker's intent that it should be acted on by the person to whom it is made;
6. The hearer's ignorance of its falsity;
7. The hearer's reliance on the truth of the representation;
8. The hearer's right to rely upon it; and
9. The hearer's consequent damage.

*Bavand v. OneWest Bank*, 176 Wn.2d 47, 55 (2013).

Defamation Elements (Washington Common Law)

Under Washington law, defamation requires:

1. A false and defamatory statement concerning another;
2. An unprivileged publication to a third party;
3. Fault, as judged by at least a negligence standard; and
4. Actionable harm either as a matter of law or as a matter of fact.

*Crane v. The State of Washington*, 128 Wn.2d 140, 148 (1995).

Criminal Fraud Statute (RCW 9A.60.020)

RCW 9A.60.020 criminalizes knowingly making false or misleading material statements in written instruments, which may provide a basis for civil liability.

Analysis:

1. Fraud.

      1. False Representations of Existing Facts Zhang made numerous false representations regarding Plaintiff's performance and conduct:

1. Fabricated performance documentation by backdating entries to create false records of poor performance (Facts 44, 48, 59, 61, 71, 77, 86)
2. Created false contemporaneous meeting notes for 1:1 meetings that never occurred (Facts 44, 48, 61)
3. Made false statements to HR and legal counsel regarding Plaintiff's work performance and conduct (Facts 135-136)

2. Materiality These representations were material because they:

1. Directly influenced termination decisions
2. Formed the basis for WBD's defense in EEOC proceedings
3. Affected Plaintiff's professional reputation and future employment prospects

3. Falsity and Knowledge of Falsity The representations were objectively false, as evidenced by:

1. Google Docs edit history showing systematic backdating of performance notes (Facts 44, 59, 61, 71, 77)
2. Email and Slack records contradicting Zhang's documented claims about meeting occurrences
3. Zhang's own admission that no major performance issues existed before May 2023 (Fact 53)

Zhang had actual knowledge of falsity because she:

1. Deliberately backdated entries
2. Created notes for non-existent meetings
3. Accessed and edited documents immediately after learning of Plaintiff's pregnancy accommodation request (Fact 44)

4. Intent to Induce Reliance Zhang intended that WBD management, HR, and legal counsel rely on her false documentation to:

1. Justify Plaintiff's termination
2. Defend against discrimination claims
3. Create a pretextual performance-based reason for adverse employment action

5. Perjury in Declaration Under Penalty of Perjury Zhang's fraudulent conduct escalated to perjury when she signed a Declaration under penalty of perjury under Washington State law (Fact 141) containing material false statements designed to reverse the EEOC's preliminary finding of cause:

1. Falsely stated she managed Plaintiff from "October 2022 to September 2023" when corporate personnel files and Slack history clearly show she managed Plaintiff from June 3, 2022 to September 30, 2023 (Facts 12e, 141d)
2. Made false statements about on-call duties and work hours to contradict Plaintiff's accommodation needs (Facts 141e-m)

3. Deliberately provided false information to undermine the EEOC's preliminary finding of discrimination

6. Conspiracy with WBD Legal Counsel Zhang's fraud was furthered by WBD's legal counsel's deliberate misrepresentations to the EEOC:

1. Falsely stated there were "six engineers" under Zhang and "three females" including Shuo Li (Facts 136a-b)
2. Concealed that Shuo Li reported to Dan Gur, not Zhang, as clearly shown in the organization chart (Facts 20-22)
3. Deliberately inflated the number of female engineers under Zhang to conceal gender discrimination
4. Created false impression that Zhang had authority over employees she could not terminate

7. Justifiable Reliance and Damages WBD's legal counsel relied on Zhang's false statements in their EEOC response (Facts 135-136), and Plaintiff suffered damages including:

1. Wrongful termination
2. Loss of income and benefits
3. Damage to professional reputation
4. Emotional distress
5. Interference with EEOC proceedings

2. Defamation

1. False and Defamatory Statements Zhang made false statements that injured Plaintiff's reputation:

1. Accused Plaintiff of "poor performance" and "poor communication" since returning from maternity leave (Fact 135)
2. Falsely characterized Plaintiff as "non-responsive," "working in loud restaurants," and "abandoning work without notice" (Fact 135)
3. Created false documentation suggesting ongoing performance problems

2. Publication to Third Parties These statements were published to:

1. WBD management and HR personnel
2. Legal counsel representing WBD in EEOC proceedings
3. Other employees through fabricated documentation

3. Fault/Negligence Zhang acted with at least negligence, and likely actual malice, given:

1. Her systematic fabrication of documentation
2. Knowledge of the statements' falsity
3. Retaliatory motive following Plaintiff's accommodation request

4. Pattern of Bad Faith and Deliberate Concealment Both Zhang and WBD's legal counsel demonstrated a consistent pattern of bad faith through:

1. Systematic fabrication of evidence

2.  Perjury under oath to reverse EEOC findings
3.  Deliberate concealment of material facts regarding organizational structure
4.  Coordinated effort to present false information to federal investigators

5. Actionable Harm Plaintiff suffered reputational harm affecting her:

1.  Professional standing in the industry
2.  Future employment opportunities
3.  Standing among colleagues and peers
4.  Interference with federal civil rights proceedings

Conclusion:

Defendant Zhang committed fraud by systematically fabricating performance documentation with knowledge of its falsity, intending that WBD rely on such documentation to justify adverse employment actions against Plaintiff. Zhang's fraudulent conduct escalated to perjury when she made false statements under penalty of perjury in her Declaration to the EEOC, including basic factual errors about her management timeline and deliberate misrepresentations about working conditions. This fraud was furthered by WBD's legal counsel's deliberate concealment of organizational facts, including falsely inflating the number of female engineers under Zhang's management to conceal gender discrimination.

Zhang also committed defamation by making false statements about Plaintiff's work performance and conduct that damaged her professional reputation. The pattern of bad faith demonstrated by both Zhang and WBD's legal counsel—including perjury, fabrication of evidence, and deliberate concealment of material facts—establishes deliberate and malicious intent to harm Plaintiff's reputation and interfere with federal civil rights proceedings.

These acts violated Washington common law and potentially RCW 9A.60.020, entitling Plaintiff to compensatory and punitive damages.

COUNT IX
AIDING AND ABETTING DISCRIMINATION
(WLAD, RCW 49.60.220)
(Against all defendants)

Issue:

Whether Defendants Warner Bros. Discovery, Inc., Xiaotong Zhang, Hannah Lucille, and Deepna Devkar aided and abetted unlawful discrimination against Plaintiff in violation of the Washington Law Against Discrimination (WLAD), RCW 49.60.220.

Rule:

Under RCW 49.60.220, it is an unfair practice for any person to aid, abet, incite, compel, or coerce the doing of any act declared to be an unfair practice by the WLAD, or to attempt to do so. The elements of an aiding and abetting claim are:

1. The existence of an underlying discriminatory act that violates the WLAD;
2. Knowledge by the defendant of the discriminatory conduct;
3. Substantial assistance or encouragement by the defendant in the commission of the discriminatory act; and
4. The defendant's conduct was a substantial factor in causing the discrimination.

A defendant aids and abets discrimination when they knowingly provide substantial assistance to facilitate discriminatory conduct, whether through direct participation, encouragement, or willful blindness to obvious discriminatory acts.

Analysis:

1. Existence of Underlying Discriminatory Acts

The record establishes multiple underlying discriminatory acts violating the WLAD:

Pregnancy Discrimination: Xiaotong Zhang engaged in a pattern of discriminatory conduct based on Plaintiff's pregnancy status, including:

1. Refusing to accommodate Plaintiff's pregnancy-related medical restrictions (Facts 38-43)
2. Retaliating against Plaintiff for requesting reasonable accommodations (Facts 44-46)
3. Fabricating performance documentation immediately after learning of Plaintiff's pregnancy (Facts 44, 61)
4. Seeking to terminate Plaintiff during her pregnancy for pretextual reasons (Facts 73)

Sex Discrimination: The evidence demonstrates disparate treatment based on sex:

1. Plaintiff was the only female engineer terminated from her team (Facts 81-82)
2. Male colleagues received promotions while Plaintiff was denied advancement during pregnancy (Fact 9)
3. Recent testimony reveals a pattern of hostile treatment toward female engineers while favoring male colleagues (Facts 143-145)

2. Knowledge of Discriminatory Conduct

Each defendant had actual or constructive knowledge of the discriminatory conduct:

Warner Bros. Discovery, Inc.: The corporate entity had knowledge through:

1. HR personnel who received Plaintiff's accommodation requests and failed to respond (Facts 38-43)
2. The company's internal investigation that revealed discriminatory conduct (Facts 89-112)
3. Legal counsel's awareness of fabricated documentation and retaliatory conduct during EEOC proceedings (Facts 135-136)

Xiaotong Zhang: As the direct supervisor, she had actual knowledge of:

1. Plaintiff's pregnancy and accommodation requests (Facts 38, 60)
2. Her own retaliatory actions and fabrication of performance records (Facts 44, 61, 73)
3. The discriminatory nature of her conduct toward female engineers (Facts 143-145)

Hannah Lucille: As HR representative handling Plaintiff's post-termination matters, she had knowledge through:

1. Her role in managing Plaintiff's separation and severance negotiations (Facts 87, 95-96)
2. Direct communications with Plaintiff regarding discrimination complaints (Facts 89, 111-112)
3. Information provided by internal investigators about discriminatory conduct (Facts 104, 112)

Deepna Devkar: As the decision-maker for the termination, she had knowledge through:

1. Information provided by subordinates Allen Gay and Xiaotong Zhang (Fact 18)
2. Her role in the alleged "restructuring" that targeted only pregnant employees (Facts 135, 137)

3. Substantial Assistance or Encouragement

Each defendant provided substantial assistance in facilitating the discrimination:

Warner Bros. Discovery, Inc.:

1. Failed to investigate or respond to Plaintiff's accommodation requests (Facts 38-43)
2. Implemented policies that enabled discrimination, including email destruction to eliminate evidence (Facts 146-148)
3. Provided legal and institutional support for discriminatory termination decisions
4. Ratified and defended discriminatory conduct through false EEOC responses (Facts 135-136)

Xiaotong Zhang:

1. Directly perpetrated discriminatory acts as the primary actor
2. Created false documentation to justify discriminatory termination (Facts 44, 61, 77-78)
3. Encouraged and facilitated hostile work environment for female engineers (Facts 143-145)

Hannah Lucille:

1. Misrepresented the purpose of the severance package as providing "holistic support" while conditioning it on participation in a biased investigation (Facts 95-96, 99)
2. Cancelled scheduled calls without notice and misrepresented communications to the EEOC by omitting the cancellation (Facts 87, 91)
3. Acted in bad faith by ghosting Plaintiff for extended periods while claiming to provide support (Facts 103-104, 107, 111)
4. Tied severance negotiations to the outcome of a sham investigation rather than addressing legitimate discrimination concerns (Facts 96, 99, 112)
5. Failed to follow through on her own commitments to provide transparent process and timely responses (Facts 107, 111-112)

Deepna Devkar:

1. Made termination decisions based on discriminatory information provided by subordinates
2. Implemented allegedly neutral "restructuring" policies that had discriminatory impact
3. Failed to conduct independent assessment of termination decisions affecting pregnant employees

4. Substantial Factor in Causing Discrimination

Each defendant's conduct was a substantial factor in causing the discrimination:

The coordinated effort between corporate policies, managerial decisions, HR misconduct, and executive approval created a systematic pattern of discrimination. Hannah Lucille's bad faith conduct was particularly crucial in preventing any meaningful resolution and ensuring the discriminatory termination remained unchallenged. Her actions transformed what could have been an opportunity to remedy discrimination into a mechanism for further harm through false promises, procedural manipulation, and deliberate obstruction of Plaintiff's rights.

Conclusion:

Based on the established facts, all defendants aided and abetted unlawful discrimination in violation of RCW 49.60.220. The evidence demonstrates the existence of underlying discriminatory acts, each defendant's knowledge of such discrimination, their substantial assistance in facilitating the discriminatory conduct, and the causal connection between their actions and the resulting harm to Plaintiff. Therefore, Plaintiff has stated a valid claim for aiding and abetting discrimination under the WLAD against all defendants.

COUNT X
SPOLIATION OF EVIDENCE
(Washington Common Law)
(Against Warner Bros. Discovery)

Issue:

Whether Defendant Warner Bros. Discovery committed spoliation of evidence under Washington common law by intentionally destroying, concealing, or failing to preserve relevant evidence after receiving notice of Plaintiff's litigation, thereby prejudicing Plaintiff's ability to prove her discrimination and retaliation claims.

Rule:

Under Washington common law, spoliation of evidence occurs when a party destroys, conceals, or fails to preserve evidence that is relevant to litigation after receiving notice of potential litigation. The elements of a spoliation claim are:

1. Duty to Preserve: The defendant had a duty to preserve evidence relevant to reasonably foreseeable litigation;
2. Breach of Duty: The defendant breached this duty by destroying, concealing, or failing to preserve evidence;
3. Relevance: The destroyed evidence was relevant to the plaintiff's claims;
4. Prejudice: The destruction of evidence prejudiced the plaintiff's ability to prove their case; and
5. Causation: The spoliation was the proximate cause of the plaintiff's inability to prove essential elements of their case.

Washington courts recognize both first-party and third-party spoliation claims. The duty to preserve evidence arises when litigation is reasonably foreseeable, which can occur before formal litigation is commenced. The spoliation may be intentional or negligent, with intentional spoliation warranting more severe sanctions.

Analysis:

1. Duty to Preserve Evidence

Warner Bros. Discovery had a clear duty to preserve evidence relevant to Plaintiff's discrimination and retaliation claims. This duty arose no later than:

1. September 21, 2023, when Plaintiff filed a "Formal Complaint about Pregnancy Discrimination" with HR (Fact 89);
2. September 29, 2023, when Plaintiff specifically requested during the internal investigation that HR preserve all communications between Xiaotong Zhang and HR regarding Plaintiff's case (Fact 101);

3. November 22, 2023, when Plaintiff's legal counsel served WBD with a formal litigation hold notice via first class mail and electronic mail, which "formally advised Defendant of its obligation to preserve all documents and electronic records relating to Plaintiff's employment" and "specifically identified categories of evidence requiring preservation, including emails, personnel records, performance evaluations, and all electronic data stored on company systems" (Fact 113).

The duty was clearly established and communicated to Defendant through multiple channels over several months.

2. Breach of Duty to Preserve

Defendant systematically breached its duty to preserve evidence through multiple acts of destruction and concealment:

1. Destruction of Email Evidence:

1. Within six months of receiving notice to retain all emails related to Plaintiff, Defendant "implemented an automatic email deletion policy to delete all emails older than 180 days old" (Fact 146(a));
2. By May 2025, "searches for Plaintiff's name in their company mailboxes returned no result" (Fact 147);
3. Current employees explicitly questioned whether this policy change represented "an intentional effort to eliminate evidence relevant to Plaintiff's case" (Fact 146(b));
4. Evidentiary documentation shows the email retention policy notification with timestamp confirming systematic deletion (Fact 148).

2. Destruction of Performance Documentation:

1. After receiving litigation hold notices, "existing documents were migrated from Google Docs to OneNote and edit histories weren't preserved, despite being technically feasible to transfer with full metadata" (Fact 134);
2. This destruction eliminated crucial evidence of Xiaotong Zhang's fabricated performance documentation, including the edit history showing backdated entries created after Plaintiff's accommodation request (Facts 44, 61, 71, 77).

3. Destruction of On-Call Records:

1. "The software and platform for managing on-call duties and maintaining on-call history was changed from Splunk On-Call to PagerDuty" soon after legal preservation notices in 2024 (Fact 149(b));
2. Current employees "were not able to access past on-call history" (Fact 149(c));
3. This destruction eliminated evidence contradicting Xiaotong Zhang's false declaration regarding Plaintiff's on-call duties and work hours (Facts 141, 139).

3. Relevance of Destroyed Evidence

The destroyed evidence was directly relevant to Plaintiff's core claims:

1. Email Communications: The destroyed emails would have contained communications between Xiaotong Zhang and HR regarding Plaintiff's pregnancy accommodation request and Xiaotong

Zhang's admitted efforts to find "legally defensible" reasons to terminate Plaintiff (Fact 73). Plaintiff specifically requested preservation of these communications during the internal investigation (Fact 101).

2. Performance Documentation Edit History: The destroyed edit histories would have definitively proven that Xiaotong Zhang fabricated performance issues after learning of Plaintiff's pregnancy, demonstrating pretext and discriminatory intent (Facts 44, 61, 78).

3. On-Call Records: The destroyed on-call records would have contradicted Xiaotong Zhang's false sworn declaration and supported Plaintiff's accommodation request based on the 40-hour work week medical restriction (Facts 141, 139).

## 4. Prejudice to Plaintiff

The destruction of evidence has severely prejudiced Plaintiff's ability to prove her claims:

1. Loss of Direct Evidence: Plaintiff cannot access the specific HR communications that would prove discriminatory intent and retaliation;

2. Inability to Impeach False Testimony: Without the original edit histories and on-call records, Plaintiff cannot definitively prove the falsity of Defendant's sworn statements to the EEOC;

3. Burden Shifting: The destruction forces Plaintiff to rely on circumstantial evidence and witness testimony rather than contemporaneous business records.

## 5. Causation

The spoliation directly caused Plaintiff's inability to prove essential elements of her discrimination and retaliation claims. The destroyed evidence contained the most probative proof of:

1. Defendant's knowledge of Plaintiff's protected status
2. The pretextual nature of the performance issues
3. The retaliatory motive behind the termination
4. The false statements made to the EEOC

Conclusion:

Warner Bros. Discovery committed spoliation of evidence under Washington common law by systematically destroying relevant evidence after receiving multiple notices of its duty to preserve. The destruction included crucial email communications, performance documentation edit histories, and on-call records that were directly relevant to Plaintiff's discrimination and retaliation claims. This intentional spoliation has severely prejudiced Plaintiff's ability to prove her case and warrants appropriate sanctions, including adverse inference jury instructions and monetary sanctions.

WHEREFORE, Plaintiff respectfully requests this Court find that Defendant Warner Bros. Discovery committed spoliation of evidence and grant appropriate sanctions including, but not limited to, adverse inference jury instructions, monetary sanctions, and such other relief as this Court deems just and proper.

COUNT XI:
Breach of Contract
Washington Common Law
(Against Warner Bros. Discovery, Inc.)

Issue:

Whether Defendant Warner Bros. Discovery, Inc. breached the Restricted Stock Unit Grant Agreement (RSU Agreement) by canceling Plaintiff's 1,902 RSU shares awarded on March 1, 2023, without notification or justification, causing Plaintiff financial harm.

Rule:

Under Washington law, a breach of contract occurs when: (1) a valid contract exists; (2) a duty is imposed by the contract; (3) the defendant breached that duty; and (4) the plaintiff suffered damages as a result. *See Myers v. State*, 152 Wn. App. 823, 218 P.3d 241 (2009). A contract is valid if it involves mutual assent, consideration, and lawful subject matter. *See Yakima County (West Valley) Fire Prot. Dist. No. 12 v. City of Yakima*, 122 Wn.2d 371, 858 P.2d 245 (1993). For restricted stock units, the terms of the grant agreement, including vesting schedules and forfeiture conditions, govern the parties' rights and obligations. Breach occurs if the employer cancels vested or unvested RSUs without adhering to the agreement's terms, such as notice requirements or clawback provisions. *See Keystone Land & Dev. Co. v. Xerox Corp.*, 152 Wn.2d 171, 94 P.3d 945 (2004). Damages may include the value of lost shares or lost appreciation. *See Lewis v. Lockheed Shipbuilding & Constr. Co.*, 36 Wn. App. 607, 676 P.2d 545 (1984).

Analysis:

1. Valid Contract: A valid contract existed between Plaintiff and Defendant Warner Bros. Discovery, Inc. through the Restricted Stock Unit Grant Agreement (RSU Agreement) executed on March 23, 2023 (Fact 121). The RSU Agreement, governed by Delaware law but enforceable in Washington under choice-of-law principles for a Washington-based employee, awarded Plaintiff 1,921 RSU shares with a grant date of March 1, 2023, and a vesting schedule of 480 shares on March 1, 2024, 480 shares on March 1, 2025, 480 shares on March 1, 2026, and 481 shares on March 1, 2027 (Fact 121; RSU Agreement, Appendix: Vesting Schedule). The agreement was supported by mutual assent, with Plaintiff accepting the award, and consideration, as Plaintiff's continued employment was a condition of vesting. The subject matter—equity compensation—is lawful.

1. Duty Imposed: The RSU Agreement imposed a duty on Defendant to honor the vesting schedule and distribute the RSU shares upon vesting, subject to specific conditions. The agreement provides that RSUs vest assuming Plaintiff remains employed, with accelerated vesting upon death, disability, retirement, or certain terminations without cause, and forfeiture only if employment terminates for cause or other specified conditions (RSU Agreement, Section 1). The Clawback provision allows cancellation only if the Compensation Committee determines Plaintiff engaged in fraud or misconduct resulting in financial restatement, with notice and a 10-day payment demand (RSU Agreement, Section 4). Termination without cause triggers continued vesting for 90 days or the severance period, whichever is greater (RSU Agreement, Section 1). Defendant had a duty to notify Plaintiff of any cancellation and comply with these terms.

2. Breach: Defendant breached the RSU Agreement by canceling 1,902 of Plaintiff's 1,921 RSU shares between September 30, 2023, and December 29, 2024, without notification or justification (Fact 121). Plaintiff's employment was terminated on September 30, 2023, for "job elimination" (Fact 82), a termination without cause under the agreement's definition (RSU Agreement, Section 1). Under the vesting schedule, 480 shares were set to vest on March 1, 2024, yet Defendant

canceled the shares without providing the required 90-day vesting period or severance-based vesting, and without evidence of fraud or misconduct triggering the Clawback (Facts 82, 121; RSU Agreement, Sections 1, 4). No notice was given, violating the agreement implied duty of good faith and the Clawback notice requirement (Fact 121; RSU Agreement, Section 4). The cancellation also occurred after Plaintiff declined a severance agreement retaining her rights (Fact 3), further indicating no lawful basis for forfeiture.

3. Damages: Plaintiff suffered damages from the breach, including the loss of 1,902 RSU shares valued at their market price as of the cancellation date, plus any appreciation lost due to the unauthorized cancellation. The RSU Agreement ties value to stock price, which fluctuates, and Plaintiff was deprived of the opportunity to receive or sell the shares (RSU Agreement, Cover Letter). The lack of notification prevented Plaintiff from mitigating damages, exacerbating her financial harm following termination (Fact 121).

Conclusion:

Defendant Warner Bros. Discovery, Inc. breached the Restricted Stock Unit Grant Agreement by canceling Plaintiff's 1,902 RSU shares without notification or lawful justification, violating the agreement's vesting and Clawback provisions. This breach occurred after Plaintiff's termination without cause on September 30, 2023, entitling her to continued vesting, and without evidence of fraud or misconduct. Plaintiff suffered financial damages from the loss of the RSU shares and their potential appreciation. Plaintiff is entitled to compensatory damages for the value of the canceled shares, lost appreciation, and other relief as permitted under Washington law.